Matthew M. Becker and Anne M. Becker v. Commissioner.
Becker v. Commissioner
Docket Nos. 61468, 67214.
United States Tax Court
T.C. Memo 1959-19; 1959 Tax Ct. Memo LEXIS 232; 18 T.C.M. (CCH) 95; T.C.M. (RIA) 59019; January 30, 1959
*232 John P. Allison, Esq., 521 Fifth Avenue, New York, N.Y., and Stanley W. Herzfeld, Esq., for the petitioners. Emil Sebetic, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: In these consolidated proceedings respondent determined deficiencies in income tax for the years 1953 and 1954 of $54,427.28 and $5,043.32, respectively. Petitioners allege that respondent erred in disallowing deductions claimed for interest paid in those years in the respective amounts of $29,048.80 and $8,412.87 in connection with the purchase of United States Treasury notes, the interest on which is fully taxable. Alternatively, with regard to 1953, they allege that respondent erred in failing to allow as a loss deduction $8,524.17 paid in connection with the acquisition of the Treasury notes, in including in taxable income $45,841.24 as interest on Treasury notes, and in failing to exclude from taxable income $28,937.50 reported as a long-term capital gain on the sale of Treasury notes. Findings of Fact Some of the facts are stipulated and are found accordingly. Matthew M. Becker, hereafter referred to as petitioner, and Anne M. Becker are husband *233 and wife residing in Jamaica, New York. They filed joint Federal income tax returns for the years 1953 and 1954 with the director of internal revenue at Brooklyn, New York. These returns were prepared on a cash basis. Petitioner is an electrical engineer and during the taxable years was a partner in Standard Switchboard Company, a manufacturer of electrical equipment. He owned some stocks and bonds and was, in general, familiar with buying and selling securities and financial quotations appearing in newspapers. For advice he occasionally consulted George Marks, his accountant since 1942. Late in 1952 or early in 1953, Marks suggested that petitioner consider the purchase of American Telephone and Telegraph convertible debentures. Marks pointed out that these securities could be acquired with a relatively small cash investment by borrowing against them at 3 per cent interest. Petitioner did not buy the debentures because continuation of the 3 per cent interest rate could not be assured. Early in 1953, Marks learned from another client that an investment could be made in short-term United States securities. Marks obtained the name of Eli Livingstone, a Boston bond dealer who claimed *234 that he could arrange for the "purchase" of large blocks of short-term Government securities for a relatively small amount of cash and could obtain a low interest "loan" for the balance of the purchase price. Around February 1, 1953, Marks met with Eli Livingstone who was then engaged in the securities business in Boston under the name of Livingstone & Company, hereafter referred to as Livingstone, a sole proprietorship. He explained to Marks that he could arrange for the "purchase" of United States Treasury 1 3/8 per cent notes maturing March 15, 1954 for $2,000 cash per million dollars of notes and that he could obtain financing of the balance of the "purchase" price on a nonrecourse basis at an interest rate of 2 3/8 per cent per annum, guaranteed to maturity, with a prepayment penalty of 1/4 of 1 per cent. Livingstone informed Marks that the Treasury notes were then selling below par, that they called for payment at par at maturity, and that they might reach par or even higher before maturity by reason of exchange privileges or money market conditions. He mentioned the deductibility of the interest paid, which, coupled with capital gain treatment of possible profit, assured a substantial *235 benefit to a highbracket taxpayer even if the notes were held to maturity. Livingstone agreed to make the necessary financial arrangements. Thereafter, petitioner authorized Marks to enter into a transaction, the detailed steps of which were in the form as hereafter described. On April 6, 1953, Marks placed an order for petitioner with Livingstone to buy $5,000,000 face amount of United States Treasury 1 3/8 per cent notes maturing March 15, 1954, and Livingstone executed it by placing an order with C.F. Childs and Company, hereafter referred to as Childs, Government bond dealers, for delivery to his account at the Guaranty Trust Company of New York, hereafter referred to as Guaranty. Livingstone sent confirmation of this purchase as petitioner's agent to petitioner and to Childs and the latter confirmed its sale to Livingstone for the account of petitioner. The purchase price of the Treasury notes was 99 9/32, which amounted to a principal sum of $4,964,062.50, plus accrued interest of $4,296.87, making a total purchase price of $4,968,359.37. Petitioner paid $10,000 in cash by check dated April 8, 1953 to Livingstone's order, and on April 7, 1953, executed a promissory note *236 to the order of Seaboard Investment Associates, Inc., hereafter referred to as Seaboard, which reads in part as follows: "On March 15, 1954 I promise to pay to * * * Seaboard * * * (hereinafter referred to as the obligee) the sum of - FOUR MILLION NINE HUNDRED FIFTY-EIGHT THOUSAND THREE HUNDRED FIFTY-NINE AND 37/100 DOLLARS together with interest on unpaid balances at the rate of 2 3/8% per annum, subject to the following rights and conditions, having deposited with the said obligee the following securities as collateral: "$5,000,000 U.S. Treasury 1 3/8% Notes of March 15, 1954 "The undersigned gives to the obligee a lien against the securities pledged for the amount of the obligations set forth herein, and gives to the obligee the right to hypothecate and use the securities pledged for any purpose while so pledged. Said right is not to be inconsistent in any manner with the ownership by the undersigned of the said collateral, and with the right to the undersigned to obtain the return of the collateral at any time upon tender of payment of the principal and interest due hereunder. "The undersigned shall not be called upon nor be liable to furnish additional collateral to *237 the obligee at any time. "The undersigned may anticipate payment, in whole or in part, at any time, of the amount due hereunder, and shall receive back a pro rated portion of the collateral so held; provided nevertheless that interest at the rate of 1/4 of 1% per annum pro rated to the maturity date shall be charged on the amount or amounts so paid by anticipation. "All payments received by the obligee directly from or indirectly for the account of the undersigned shall be applied first to payment of interest and any balance thereof applied to payment of principal due hereunder as the obligor shall elect. "The undersigned shall not in any event be personally liable to pay any of the principal indebtedness hereof or interest arising hereunder (including the penalty interest of 1/4 of 1% per annum for prepayment) except from the proceeds from the sale of the said collateral deposited. Application of the proceeds from the sale of the said collateral by the obligee shall be a full accord and satisfaction of any and all claims hereunder and act as a full and complete discharge of any and all liability of the undersigned. "This note has been entered into in the City of New York and *238 shall be construed and interpreted in accordance with the laws of the State of New York." On April 7, 1953, petitioner addressed a letter to Livingstone directing that the Treasury notes be delivered to Seaboard against payment by that company of $4,958,359.37. He also addressed a letter to Seaboard directing it to receive the Treasury notes from Livingstone against payment to Livingstone of $4,958,359.37, "the proceeds of my loan with you." On April 6, 1953, Livingstone, by letter, instructed Guaranty to receive the Treasury notes from Childs, account of petitioner, against payment to Childs of $4,968,359.37, and instructed that its (Livingstone's) account be charged in that amount. The function of Guaranty in the transaction was to clear securities, according to instructions of Livingstone, who had an account with the bank for that purpose. For its services Guaranty received a fee. On April 6, 1953, by another letter to Guaranty, Livingstone instructed Guaranty to deliver to Childs, from its (Livingstone's) account, the $5,000,000 face amount of Treasury notes against payment of $4,967,578.12. On April 8, 1953, the Treasury notes were received from Childs by Guaranty, which duly *239 charged Livingstone's account on its books with the sum of $4,968,359.37 and drew a check to Childs for the same amount. In accordance with Livingstone's instructions the same Treasury notes were redelivered on the same day by Guaranty to Childs, and on the same day Childs made payment by its check to Guaranty. Actually, neither petitioner, Livingstone nor Seaboard ever obtained physical possession of the Treasury notes. On April 6, 1953, Livingstone issued a confirmation slip to Seaboard stating that as agent for Seaboard it had sold for Seaboard's account $5,000,000 face amount of Treasury notes at 99 17/64 for a total principal price of $4,963,281.25, plus interest in the amount of $4,296.87, less Livingstone's commission in the amount of $6,250, resulting in a net selling price of $4,961,328.12. Neither petitioner nor Marks gave an order for such sale. The books of Seaboard contain entries under date of April 7, 1953, recording a note receivable from the petitioner in the amount of $4,958,359.37 and crediting "L. & Co. Acc. Rec." in the same amount. Seaboard submitted a statement, dated September 22, 1953, to petitioner in care of Marks, showing: Int. at 2 3/8% on $4,958,359.37 from
4/7/54 to 9/15/53
$52,665.21
Credits
Coupon 9/15/53
$34,375.00
Less accrued interest
4,296.87
30,078.13
Balance due
$22,587.08
*240 Petitioner drew a check, dated October 1, 1953, payable to Seaboard's order for $22,587.08, which was negotiated on October 6, 1953. This payment was made at the suggestion of Marks and was motivated by a desire to obtain an income tax deduction in 1953. Before advising that the payment be made, Marks had ascertained that the increase in market value of petitioner's Treasury notes held by Seaboard as security was sufficient to warrant an additional loan of $22,500 without new collateral and that Seaboard would make the loan at the interest rate of 2 3/8 per cent. Marks arranged for such a loan and Seaboard issued a check, dated October 5, 1953, to petitioner's order for $22,500. To evidence his new indebtedness petitioner executed and delivered an additional promissory note to Seabord on October 5, 1953 in the sum of $22,500. At this time petitioner's net worth was approximately $400,000. Entries dated October 5, 1953 in Seaboard's books reflect the receipt of $22,587.08 as interest from petitioner and a loan to petitioner of $22,500. In the latter part of October 1953, petitioner and Marks concluded that it would be advisable for petitioner to sell his Treasury notes, and petitioner *241 directed Marks to place a sell order on his behalf. The daily bid prices from October 20, 1953 to October 31, 1953 were: October
20, 21, 22, 23
99 31/32
26
100 1/32
27
100
28
100 1/32
29, 30, 31
100 2/32 Following petitioner's instructions Marks placed a sell order. Livingstone notified him that the order could not be executed, Seaboard having taken a short position in the Treasury notes which it could not cover because of the rise in the market price. After learning that the order could not be executed, Marks met with Livingstone in Boston to assert petitioner's claim. Livingstone told Marks that Seaboard was legally responsible but that it did not have the financial resources to make good and that any attempt to collect from it would result in bankruptcy. Marks reported this discussion to petitioner, and it was decided to negotiate the best possible settlement. Marks' negotiations for a settlement with Livingstone on petitioner's behalf resulted in an agreement, dated December 7, 1953, drawn by petitioner's attorney, under which petitioner "sold" his Treasury notes to Livingstone, which assumed his principal "indebtedness" to Seaboard in the sum of $4,976,562.50. *242 Petitioner, however, remained liable to Seaboard for "interest" in the amount of $27,224.83 and a prepayment penalty of $3,386.78, or a total of $30,611.61. Petitioner's notes, dated April 7 and October 5, were returned to him marked "12/7/53 Paid and Surrendered" by Seaboard. Petitioner paid his obligation to Seaboard as follows: The accrued interest on the Treasury notes on December 7, 1953 in the sum of $15,763.11 was credited to him; the sum of $6,461.72 was paid by check, dated December 10, 1953; the sums of $5,000 and $3,386.78 (evidenced by notes, dated December 7, 1953, payable with interest at 4 per cent) were paid on January 4, 1954, the combined payment plus interest totaling $8,412.87. Under the terms of the settlement agreement Livingstone was required to, and did, pay petitioner $17,162.50. Of this amount, $1,831 had been paid on account on November 23, 1953 and the balance of $15,331.50 was paid on December 7, 1953. These amounts were charged to Seaboard on Livingstone's books and records. Livingstone's books and records do not contain any entries reflecting the purchase of Treasury notes from petitioner. Petitioner also paid an attorney's fee of $725. Petitioner's *243 "purchase" and "sale" of Treasury notes resulted in a financial loss to him of $8,524.17, computed as follows: Original cost: Cash
$ 10,000.00
Original loan
4,958,359.37
Total cost
$4,968,359.37
Interest and penalty payments: October 1, 1953
$22,587.08
December 10, 1953
6,461.72
January 4, 1954
8,412.87
Total interest and penalty
payments
37,461.67
$5,005,821.04
Less: Credit for accrued interest at date
of purchase
4,296.87
Balance
$5,001,524.17
Received on settlement: Loan assumed
$4,976,562.50
Cash
17,162.50
4,993,725.00
Loss
$ 7,799.17
Attorney's fee
725.00
Total loss
$ 8,524.17
Seaboard was incorporated under the laws of Massachusetts on February 2, 1953. Its balance sheet reflects assets and liabilities at the close of its fiscal year ended January 31, 1954, as follows: ASSETS
Cash
$ 1,639.82
Notes and accounts receivable
178,181,721.98
Accrued interest receivable
610,894.82
Organization expense
50.00
Total assets
$178,794,306.62
LIABILITIES
Accounts payable
$ 2,500.00
Short sales
179,031,977.04
Capital stock
500.00
Surplus or (Deficit)
(240,670.42)
Total liabilities
$178,794,306.62
*244 The weekly high and low bid prices of 1 3/8 per cent Treasury notes due March 15, 1954 around dates pertinent are stipulated to have been: Week
High
Low
4/ 6/53- 4/10/53
99 12/32
99 11/32
9/21/53- 9/25/53
99 24/32
99 23/32
9/28/53-10/ 2/53
99 28/32
99 26/32
10/ 5/53-10/ 9/53
99 30/32
99 29/32
10/19/53-10/23/53
99 31/32
99 30/32
10/26/53-10/30/53
100 2/32
100
12/ 7/53-12/11/53
100 1/32 +
100 1/32
Petitioner's 1953 and 1954 Federal income tax returns report as adjusted gross income $99,278.35 and $68,896.40, respectively. On his 1953 return petitioner included in gross income a long-term capital gain of $28,937.50, representing the excess of the amount received from Livingstone for the Treasury notes over their cost. He also deducted the sum of $29,048.80 as interest paid to Seaboard during that year. He neither included in gross income nor deducted as interest expense $45,841.24, the amount of coupon interest which matured during the year and which was applied by Seaboard in payment of additional interest due to it by petitioner. Respondent's determination of deficiency for 1953 did not exclude the capital gain from petitioner's gross income *245 and it included in gross income the coupon interest of $45,841.24. On his 1954 return petitioner deducted $8,412.87 as interest paid to Seaboard during that year. Petitioner did not pay any interest on indebtedness to Seaboard in 1953 or 1954. Opinion With the exception of such immaterial differences as names and amounts, this proceeding seems to us to be governed by (August 28, 1958), which petitioners make no attempt to distinguish. Even some of the names strike a familiar chord. As in that case, respondent recognizes the inconsistency of charging petitioner with income from interest and capital gain on the Treasury notes if his contentions are otherwise upheld. In order to permit this adjustment to be taken into account, and on the authority of the Goodstein case, Decisions will be entered under Rule 50.